# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

**DAWN M. HACKEL,**

     **Plaintiff,**

     **v.**                                              **Case No. 14-CV-1429**

**CAROLYN W. COLVIN,**
**Acting Commissioner of Social Security,**

     **Defendant.**

## DECISION AND ORDER

The plaintiff, Dawn M. Hackel, seeks judicial review of the final decision of the Commissioner of the Social Security Administration denying her claim for disability benefits and disability insurance benefits under the Social Security Act, 42 U.S.C. § 405(g). For the reasons stated below, the decision of the Commissioner is affirmed.

## PROCEDURAL HISTORY

On December 23, 2010, Hackel applied for disability benefits and disability insurance benefits, alleging she had been disabled since December 1, 2009 due to cognitive and learning disabilities, attention deficit/hyperactivity disorder ("ADHD"), speech disorder, and difficulty with memory, concentrating, and thinking. (Tr. 219.) The claims were denied initially and upon reconsideration. A hearing was held before an Administrative Law Judge on May 15, 2013. Hackel appeared and testified, as did her father, Donald Hackel. Jeffery W. Lucas, a vocational expert, also testified at the hearing. (Tr. 23.)

In a written decision issued July 10, 2013, the ALJ found Hackel did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20

C.F.R. pt. 404, subpt. P, app. 1 (the "Listings"). The ALJ further found Hackel had the residual functional capacity ("RFC") to perform a full range of work at all exertional levels, but with the following non-exertional limitations: limited to simple, routine, and repetitive work tasks; make only simple work related decisions; have only occasional contact with coworkers and supervisors; and never perform work that requires public contact. (Tr. 29.) The ALJ's decision became the Commissioner's final decision when the Appeals Council denied the plaintiff's request for review.

## FACTS

### 1. *Medical Evidence and Opinions*

#### 1.1 Treating Sources

On January 20, 2011, counselor Sofia Majid-Swanton conducted an initial information meeting with Hackel. Majid-Swanton noted that Hackel presented with a diagnosis of a learning disability ("LD") and ADHD. (Tr. 325.) She noted that Hackel's past treatments included participation in special education for all of her classes with the following accommodations: extra time for testing, reading, smaller room for testing, and tutoring. (Tr. 325-26.) Majid-Swanton stated that Hackel had a severe limitation in the area of work tolerance because she had difficulty remembering directions and following through on work tasks. (Tr. 326.) Hackel had a severe limitation in the area of work skills because she required a job coach to learn the jobs tasks of a minimum wage job. (*Id.*) Majid-Swanton further stated that Hackel had a severe limitation in the area of interpersonal skills because she had difficulty getting along with others on the job and had limitation in the area of self care because her parents paid bills for her. (*Id.*) Otherwise, Majid-Swanton noted that Hackel lived independently and was independent with her activities of daily living. (*Id.*) Hackel could also drive independently. (*Id.*) Finally, Majid-Swanton noted that Hackel

-2-

had a limitation in the area of self direction because she had to go to her supervisor on occasion with assistance in decision making. (*Id.*)

On February 25, 2011, Hackel underwent an evaluation with Dana Ray Bernstein to assist with differential diagnosis and vocational planning. (Tr. 308.) Bernstein observed that Hackel was redundant about her history and frequently needed redirection. (*Id.*) Bernstein noted that interaction with Hackel was sometimes challenging because of her redundancy and seeming inability to process or make use of explicit feedback or to take cues from redirection. (*Id.*) Bernstein stated that Hackel lacked verbal inhibitor and self-monitoring skills and seemed unaware of immediate social impact. (*Id.*) Bernstein observed Hackel had a frustrated mood and became tearful during testing. (Tr. 309.) Hackel was sometimes fidgety and Bernstein noted sustained attention and concentration were limited. (*Id.*) Bernstein noted that Hackel lived alone in a condominium and that her father and brother provided her financial support. (Tr. 331.) Hackel began having delays at age two and had early childhood intervention. (Tr. 331-32.) She was diagnosed with ADHD as a child, but never took medication. (Tr. 332.) Hackel was "always" placed in LD classes. (*Id.*)

Bernstein administered the Wechsler Adult Intelligence Scale, fourth edition (WAIS-IV) test, in which she determined Hackel had a full scale IQ of 65. (*Id.*) Hackel obtained psychometric scores ranging from severely impaired to low average. Her IQ put her in the mildly impaired (toward borderline) range (R. 333.) Bernstein also administered the Woodcock-Johnson III Test. Bernstein opined that Hackel functioned in the mildly impaired range of intellectual abilities and noted that her basic academic abilities equaled or usually exceeded expectation. (Tr. 337.) Bernstein opined that Hackel did not have a learning disorder and stated that "her somewhat better than expected performance on some academic tasks might make one wonder whether she has modestly higher

-3-

intellectual potential if only she could better direct her attention, monitor and regulate her own actions." (*Id.*) (emphasis in original). Bernstein found that Hackel's in-person presentation was highly consistent with a person who had ADHD. (*Id.*) Bernstein opined that Hackel would benefit from ADHD medication and noted that "[i]f Ms. Hackel were to have a positive response to medication, a much wider range of potential job placements might be possible." (Tr. 337-38.) However, Bernstein opined that "[a]t this time, Ms. Hackel would need special job placement with job coaching" and that "[t]ask complexity and limited opportunity for social interaction would be primary placement considerations." (Tr. 338.) Bernstein further opined that "unless Ms. Hackel were to have a favorable medication response, it would seem reasonable that some consideration be given to appealing her denial of Social Security Disability benefits because Ms. Hackel would likely eventually need to be placed at a sheltered work site (which she would likely reject)." (*Id.*) Bernstein diagnosed Hackel with ADHD-Not Otherwise Specified ("NOS") and mild mental retardation. (Tr. 339.)

On March 2, 2011, Majid-Swanton again saw Hackel and noted that she presented with the primary diagnosis of ADHD-NOS and mild mental retardation, which was diagnosed by Bernstein. (Tr. 324.) Majid-Swanton noted that it was evident during intake that Hackel had a severe limitation in the area of communication because she was redundant and obsessed about a certain issue and continually repeated herself when talking with others. (*Id.*) Majid-Swanton noted Hackel needed constant redirection and had severe limitations in the area of interpersonal skills because she lacked verbal inhibition and self monitoring skills. (*Id.*) Majid-Swanton also noted Hackel had severe limitations in the area of work skills because she required a job coach to learn her job skills and how to get along with others. (*Id.*) Hackel stated that she had a difficult time remembering directions and following through on work tasks. (*Id.*) Majid-Swanton found Hackel limited in the area of self

-4-

direction because she stated she would need to consult with her supervisor if she was unsure about what decision to make at work. (*Id.*) Majid-Swanton also opined that Hackel was not limited as to mobility, self-care, and work tolerance, but was severely limited in communication, interpersonal skills/acceptance, and work skills. (Tr. 327-28.)

On March 7, 2011, Hackel was evaluated by Christina Engen, Ph.D of the Wisconsin Forensic Unit regarding her competency to proceed in a criminal proceeding. (Tr. 617.) Dr. Engen noted that Hackel demonstrated poor interpersonal boundaries throughout the interview but responded to strong and sometimes repeated redirection and structure. (Tr. 619.) Dr. Engen found, based on Hackel's history and her manner of interaction, that Hackel had borderline intellectual functioning, but that her attention and concentration were sufficiently intact. (*Id.*) Dr. Engen opined that Hackel's "personality structure" presented challenges when interacting with others, including court principles. (Tr. 621.) She found that Hackel was inclined to violate or intrude on interpersonal boundaries, was not inclined to be sensitive to social nuances, and would likely benefit from clear communication and expectations about her behavior. (*Id.*) Dr. Engen stated that "[t]hese aspects of [Hackel's] functioning [did] not reflect an underlying mental illness or otherwise fall outside of her control. Rather, they appear[ed] to reflect the product of her underlying characterological structure." (*Id.*) Dr. Engen opined that Hackel was competent to proceed and stated that although Hackel had impaired interpersonal skills, she found no information to suggest that she could not interact with her attorney other court principals in an appropriate manner. (Tr. 622.)

On March 9, 2011, Hackel wrote a letter to Jason Bergh with the Social Security Administration stating that she was under a lot of stress and frustrated at the time of her February 2011 evaluation with Bernstein because it brought up past memories, her mother had been sick and

died three weeks prior to taking the test, and her father had been hospitalized just before the evaluation. (Tr. 306.)

On March 22, 2011, Hackel was evaluated by James Paquette, Ph.D. (Tr. 342.) Dr. Paquette noted Hackel appeared mildly anxious, but that her attention and concentration were adequate. (*Id.*) Dr. Paquette stated that Hackel's vocabulary was in the borderline/very limited range and that she participated in special education classes throughout elementary, middle, and high school. (*Id.*) Dr. Paquette noted that Hackel resided independently in an apartment. (Tr. 343.) As to her work history, Dr. Paquette noted that Hackel had an "intermittent work history in entry level employment," with her longest period of employment being five years. (*Id.*) Hackel was laid off from that position due to downsizing. (*Id.*) Dr. Paquette noted that Hackel was able to work with co-workers and supervisors and could accept directions, constructive criticism, and changes in work routine. (*Id.*) Dr. Paquette further noted that Hackel cared for her elderly father without compensation, was autonomous concerning hygiene and self-care, was able to cook simple meals, launder independently, dined out with friends, shopped for groceries, and attended church. (*Id.*) Hackel's father and brother occasionally supervised her budgeting and paying bills. (*Id.*) Dr. Paquette noted that Hackel described socializing with "a number of female peers" and found no evidence of a personality disorder. (*Id.*) Dr. Paquette stated that Hackel's borderline intellectual functioning was "evident" and found that she had limited reading comprehension ability, which suggesting a learning disorder - NOS. (Tr. 344-45.) Dr. Paquette assessed a GAF score of 51.[1] (Tr. 345.)

---

[1] "GAF" stands for "Global Assessment of Functioning." GAF is a psychiatric measure of a patient's overall level of functioning. *Jelinek v. Astrue*, 662 F.3d 805, 807 (7th Cir. 2011). A GAF between 51 and 60 reflects "'Moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).'" *Id.* at 807 n.1 (quoting American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, Text Revision (DSM-IV-TR) 34 (4th ed. 2000)).The Fifth Edition of the DSM, published in 2013, abandoned the GAF scale. *Williams v. Colvin*, 757 F.3d 610, 613 (7th Cir. 2014).

Hackel met with Majid-Swanton on March 31, 2011 regarding her job search. (Tr. 371.) Majid-Swanton noted that Hackel tended to get side-tracked and needed to lead the conversation back to the task at hand. (*Id.*) Majid-Swanton stated that Hackel was "still bent about being labeled as mentally retarded." (*Id.*)

Hackel treated with Karyn Gust-Brey, Ph.D at the Waukesha County Department of Health and Human Services approximately every two weeks from May 23, 2011 until May 21, 2012. During the intake assessment, Dr. Gust-Brey noted that Hackel's memory and concentration were intact; however, Hackel reported difficulty in both areas in terms of work history. (Tr. 426.) Dr. Gust-Brey noted Hackel repeated herself frequently and estimated that she was of below average intelligence. (*Id.*) Hackel reported that she received learning disability services in school, was "slow," and had recently completed psychological testing which indicated mild mental retardation. (*Id.*) Dr. Gust-Brey noted Hackel lived on her own, but received financial and other assistance from her father. (Tr. 427.) Dr. Gust-Brey noted Hackel experienced a long history of employment difficulties and was unable to perform well on the job because of difficulties understanding and/or remembering things. (*Id.*) Hackel stated that she could perform simple, repetitive jobs. (*Id.*) Dr. Gust-Brey diagnosed Hackel with adjustment disorder with mixed anxiety and depressed mood, mild mental retardation, and assessed a GAF of 50. (Tr. 427.)

In the sessions that followed Hackel's initial assessment, Dr. Gust-Brey consistently noted that Hackel's symptoms included anxiety, depression, loss of mother, low self-esteem, and difficulty coping with employment issues because of disability. (Tr. 416-23, 438, 451-55, 460-61, 763-65.) Dr. Gust-Brey also noted that Hackel managed her stress and depression by staying active, including by socializing with family and friends. (Tr. 416-18, 420-22, 438, 453-55, 461, 469.)

While treating with Dr. Gust-Brey, Hackel underwent several competency evaluations regarding her ability to stand trial in a criminal matter. The record indicates that Hackel did not tell Dr. Gust-Brey about her legal problems, only that she "had an emergency" and a "personal situation." (Tr. 763, 765.) On August 5, 2011, Hackel was evaluated by Dr. Erik Knudson. (Tr. 612-16.) Dr. Knudson noted that Hackel would not stop talking while he explained information and although he asked her to several times to stop and listen, she would not. (Tr. 613.) Dr. Knudson noted that Hackel was diagnosed with a learning disability as a child, was in special education classes, and has never lived independently. (*Id.*) Upon mental status examination, Dr. Knudson noted that Hackel spoke rapidly, that it was difficult to follow her train of thought at times due to her rate of speech, that she had a harsh tone and was argumentative, that she repeated herself, and that it was difficult to redirect her attention to other matters for more than a few seconds at a time. (Tr. 615.) Dr. Knudson stated that Hackel appeared to have below average intelligence, but her recent and remote memory were intact. (*Id.*)

Dr. Knudson diagnosed her with pervasive developmental disorder-NOS, borderline intellectual functioning, and mood disorder-NOS. (*Id.*) Dr. Knudson opined that Hackel had prominent difficulties with interpersonal relatedness and that it "appear[ed] clear that she [had] deteriorated in terms of her mental stability over the past year." (*Id.*) He found that Hackel exhibited symptoms of a mood disorder, but was unwilling to consider treatment. (*Id.*) Dr. Knudson opined that Hackel's intellectual abilities fell within a range between normal and mental retardation. (*Id.*) As a result, Dr. Knudson opined that Hackel lacked the substantial mental capacity to understand the proceedings and assist in her defense presently, but was likely to be restored to competency if provided treatment. (Tr. 616.) Dr. Knudson opined that Hackel needed psychotropic medications

-8-

and that "[o]nce her emotional difficulties [were] improved, it [was] anticipated that she [would] be able to resume her prior level of functioning." (*Id.*)

On January 5, 2012, Hackel underwent an additional competency evaluation by Brooke Lundbohm, Psy.D. (Tr. 527-33.) Dr. Lundbohm noted that Hackel exhibited marked thought disorganization, rapid and rambling speech, illogical thought processes, irritability, poor social boundaries, and impaired emotional control. (Tr. 530.) Dr. Lundbohm noted that Hackel was markedly difficult to engage in productive, collaborative discussion regarding her pending legal case and available legal options. (*Id.*) Hackel repeated the same statements over and over again. (Tr. 531.) Dr. Lundbohm diagnosed Hacked with pervasive development disorder-NOS, borderline intellectual functioning, anxiety disorder-NOS, and personality disorder-NOS. (*Id.*) Dr. Lundbohm opined that Hackel presently lacked the substantial mental capacity to rationally and factually understand her charges, participate in the court proceedings, or communicate with her defense attorney to aid in her own defense. (Tr. 532.) Dr. Lundbohm noted that Hackel's mental status had declined since the March 2011 evaluation in which she was found competent to proceed. (*Id.*) Dr. Lundbohm noted that Hackel repeated her desire to be found not competent in an effort to have her charges dismissed, which she felt was indicative of her distorted thought processes and impaired reasoning capacities. (Tr. 533.) Dr. Lundbohm further opined that with treatment, Hackel would "more likely than not" attain competency within the available statutory time frame. (*Id.*)

After Dr. Lundbohm's evaluation, Hackel underwent a legally mandated hospitalization. (Tr. 486.) She was admitted on January 20, 2012, and a staff psychiatrist, Dr. Marshall Bales, conducted an initial assessment. (Tr. 486-87.) He stated that her "chief complaint" was "[p]lain and simple, I want to be incompetent." (Tr. 486.) Dr. Bales noted that Hackel underwent numerous evaluation

-9-

of competency with some varying diagnostic impressions and varying impressions on competency. (*Id.*) Dr. Bales noted that Hackel's records suggested some impairments in cognition and disorganized thought. (*Id.*) He noted Hackel's history of special education classes in school and that she repeated the issue of competency. (*Id.*) Dr. Bales listed her current problems as pending legal charges, possible borderline intellectual functioning, and lack of insight. (Tr. 487.) He estimated her treatment to take 7-30 days. (*Id.*)

An initial assessment by social services on January 23, 2012 noted that Hackel had a history of special education; had never lived independently, residing in the family home for all of her life; and appeared motivated to present herself as a self-sufficient and capable woman, stating that she drives a car, takes care of herself, and can get herself out of the legal situation. (Tr. 575.) The social worker noted that Hackel stated she was seeing a therapist at Waukesha County Human Services for "stress, anxiety, adjustment disorder – nothing clinical." (*Id.*)

While undergoing inpatient treatment, progress notes showed on January 27, 2012 that Hackel stated "I have to keep acting incompetent while I'm here to get my charges dropped for my drunk driving," "I had no choice my attorney told me I have to do this to get my charges dropped," and "I just want to go home, this is taking too long to prove my disabilities, but I have to keep acting incompetent." (Tr. 703.)

A therapeutic services screening was conducted on January 30, 2012. (Tr. 582.) The evaluator noted that Hackel had her own place and also stayed with her father. (*Id.*) Hackel used to bowl on a league. (*Id.*) While she was able to communicate, she often stated the same information a number of times. (*Id.*) The evaluator noted that Hackel was rather animated about being "incompetent" and that she had "disabilities" and that "things aren't going to change." (*Id.*) The evaluator noted that

-10-

Hackel was able to attend to an activity for at least 30 minutes and that she had good memory recall. (Tr. 583.)

On January 31, 2012, a speech and language services evaluation was conducted. (Tr. 505.) The evaluator found that Hackel demonstrated below average skills in the ability to comprehend written and spoken language, which could be exacerbated by her decreased attention to task. (Tr. 508.) Hackel showed difficulty with expression, which demonstrated a below average ability to express herself using sentences. (*Id.*) The evaluator found that Hackel's test scores suggested that she might lack the content, knowledge, and vocabulary to express her ideas and understand ideas of others. (*Id.*) The evaluator also found that Hackel's limited knowledge and vocabulary contributed to her having difficulty learning new information. (*Id.*) Hackel showed decreased recall of new information after a delay. (*Id.*) These deficits were observed during testing and conversation, particularly regarding her wanting to be deemed incompetent. (*Id.*) The evaluator noted Hackel seemed to repeat wanting to be deemed incompetent. (*Id.*) The evaluator found that reading was a weakness, and when possible, unfamiliar information should not be presented in this form. (*Id.*)

On February 1, 2012, social services conducted an additional evaluation of Hackel. (Tr. 577.) The evaluator stated that Hackel's father confirmed that she had been "slow" since she was 2 or 3 years old and that she showed poor judgment and could not follow directions. (Tr. 577.) The evaluator noted Hackel continued to have difficulties with social interactions, cognitive impairment, and deficits in receptive language skills. (Tr. 579.)

Inpatient records noted on February 12, 2012 that Hackel threw a cup of ice at a peer. (Tr. 643.) A record from February 13, 2012 showed Hackel's cognition, insight, and judgment were impaired and that she continued to be incompetent to proceed. (Tr. 718.) On February 14, 2012, Dr.

-11-

Philip Sweet, a staff psychiatrist, evaluated Hackel's competence and issued a report to the judge. (Tr. 472.) Dr. Sweet opined that Hackel had pervasive development disorder-NOS and that it was "of a fairly mild degree" and that she was competent to proceed. (Tr. 474.) A treatment record dated February 21, 2012 assessed her GAF score at 52, as did a record dated February 28, 2012. (Tr. 544, 637.) On February 23, 2012, staff noted that Hackel continued to argue with them and needed to be redirected four times by two staff members to stop her behavior. (Tr. 683.)

Hackel was discharged from inpatient treatment on March 6, 2012. (Tr. 475.) Her GAF score upon discharge was 68, which indicates mild symptoms. (*Id.*) When she returned to treatment with Dr. Gust-Brey on April 2, 2012, Hackel told Dr. Gust-Brey that she had an emergency and had to travel to Green Bay for a month and a half, but would not elaborate. (Tr. 765.) Dr. Gust-Brey discussed with Hackel some "social concerns," including repetition of statements or questions without knowing it. (*Id.*) Hackel began treating with Martin Millichap on March 25, 2013 and although there are three records from Millichap in the record, they are virtually illegible. (Tr. 55, 769-71.)

### 1.2 Medical Opinions

Jack Spear, Ph.D completed a Psychiatric Review Technique on April 4, 2011. (Tr. 350.) Dr. Spear evaluated Hackel under Listings 12.02 - Organic Mental Disorder, 12.04 - Affective Disorders, and 12.05 - Mental Retardation. (*Id.*) Under Listing 12.02, Dr. Spear found the medically determinable impairment of ADHD-NOS. (Tr. 351.) Under Listing 12.04, he found the impairment of bereavement due to her mother's death. (Tr. 353.) Under Listing 12.05, he found the impairment of borderline intellectual functioning. (Tr. 354.) In evaluating the paragraph "B" criteria, Dr. Spear found Hackel had mild restrictions in activities of daily living; moderate difficulties in maintaining

-12-

social functioning and maintaining concentration, persistence, or pace; and no episodes of decompensation. (Tr. 360.) Dr. Spear found no evidence of paragraph "C" criteria. (Tr. 361.)

Dr. Spear then completed a Mental RFC Assessment. (Tr. 346-49.) In the category of understanding and memory, Dr. Spear opined that Hackel was markedly limited in the ability to understand and remember detailed instructions. (Tr. 346.) In the category of sustained concentration and persistence, Dr. Spear found Hackel was markedly limited in the ability to carry out detailed instructions and moderately limited in the ability to maintain attention and concentration for extended periods; work in coordination or proximity to others without being distracted by them; and complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. 346-37.) As to social interaction, Dr. Spear found Hackel was moderately limited in interacting appropriately with the general public; asking simple questions or requesting assistance; accepting instructions and responding appropriately to criticism from supervisors; and getting along with coworkers without distracting them. (Tr. 347.) Finally, as to adaptation, Dr. Spear opined that Hackel was moderately limited in the ability to respond appropriately to changes in the work setting and markedly limited in the ability to set realistic goals or make plans independently of others. (*Id.*)

In making his determinations, Dr. Spear considered Hackel's redundancy and inability to process and make use of explicit feedback or take cues from re-direction (making interaction challenging). (Tr. 348.) He also considered that Hackel lacked verbal inhibition and self monitoring skills. (*Id.*) Dr. Spear found Hackel's allegations partially credible. He stated that although she was diagnosed with borderline intellectual function, ADHD, and learning disability, her conditions were not totally disabling to prevent all work. (*Id.*) Dr. Spear found the overall file evidence indicated

-13-

Hackel could understand, remember, and carry out simple instructions. (*Id.*) Spear opined that Hackel would most likely have moderate difficulty relating to supervisors and coworkers, moderate difficulty with concentration, persistence, or pace, and changes. (*Id.*) Spear found, however, that Hackel "should be capable of doing unskilled work activity." (*Id.*)

On October 5, 2011, Craig Childs, Ph.D, affirmed Spear's Psychiatric Review Technique and Mental RFC Assessment. (Tr. 429.)

### 2. Hearing Testimony

#### 2.1 Hackel

Hackel testified that she lived alone in a condominium and that her father helped her with her bills. (Tr. 47.) She stated that although she had a driver's license, it was revoked as the result of a drunk driving charge. (*Id.*) Hackel testified that she attended special education classes while in school, but that she could read and write. (Tr. 48.) Hackel testified that she held numerous jobs, with her longest period of employment being five years as an assembly worker. (Tr. 50-51.) She testified that she could not keep up and that she had "many problems" in that job, as well as issues with poor performance in all of her other jobs. (Tr. 51.) Hackel testified that she does not take any medications for her impairments. (Tr. 56.) Regarding her activities, Hackel testified that she liked to read and was "sometimes" able to do things around the house. (Tr. 59.) Hackel stated that she did not have any friends and that she "stick[s] to [herself]." (Tr. 60.)

#### 2.2 Donald Hackel

Hackel's father also testified at the hearing. He stated that he only occasionally saw his daughter and that she did not help him with anything at his home. (Tr. 67-68.) He further testified that she was "slow" and attended special education classes in school. (Tr. 69.) He stated that Hackel

-14-

was fired from jobs she held because of her learning disability, stating that she "don't understand, you know, uncoordinated, slow, sloppy work, repeats a lot, you know, trying to figure out what they're saying." (*Id.*) Hackel's father testified that she was unable to understand simple directions, showed poor judgment, and inappropriately demonstrated fits of anger. (Tr. 70.) He further testified that his son assisted Hackel with her finances. (Tr. 72.)

### 2.3 Vocational Expert - Jeffery W. Lucas

The ALJ asked the VE to assume a hypothetical individual with Hackel's past work experience who was able to perform work at all exertional levels except that she would be limited to simple, routine, and repetitive work tasks involving only simple work related decisions and occasional contact with coworkers and supervisors. (Tr. 75-76.) The ALJ further asked the VE to assume the individual could not perform work requiring public contact. (Tr. 76.) Given those restrictions, the VE opined that the person could perform Hackel's past work of cleaner, housekeeper, routing clerk, and candy maker. (*Id.*) The ALJ then added the restriction that the person was unable to perform production rate paced work but was able to perform goal oriented work. (*Id.*) The VE opined that the person could still perform the cleaner and housekeeping positions, as well as work as a cutter and paster for press clippings, janitor, and cafeteria attendant. (Tr. 77.) The ALJ declined to ask the VE a hypothetical based on Dr. Gust-Brey's medical source statement because she acknowledged that Hackel would be disabled based on that medical source statement. (Tr. 78.)

### 3. ALJ's Decision

Following the five step process, the ALJ found that Hackel engaged in substantial gainful activity from January 2010 through December 2010 and during the fourth quarter of 2012. (Tr. 25.)

-15-

However, the ALJ determined that Hackel had not engaged in substantial gainful activity from January 2011 through September 2012 or after December 2012. (*Id.*) Thus, the ALJ addressed whether Hackel was under a disability during the time period beginning January 1, 2011. (*Id.*) The ALJ determined Hackel had the following severe impairments: borderline intellectual functioning and a pervasive developmental disorder. (*Id.*) The ALJ also considered the fact that Hackel was obese, but found that it was non-severe. (Tr. 26.)

The ALJ further found that Hackel's impairments did not meet or medically equal one of the Listings. (*Id.*) The ALJ assessed Hackel's impairments under Listings 12.02 - Organic Mental Disorders and 12.05 - Mental Retardation. (*Id.*) The ALJ first considered whether the "paragraph B" criteria (the "paragraph D" criteria of Listing 12.05) were satisfied. (*Id.*) To satisfy the "paragraph B" criteria, the mental impairments must result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. (*Id.*) A marked limitation means more than moderate but less than extreme. (*Id.*)

As to activities of daily living, the ALJ found Hackel had no restrictions. (*Id.*) The ALJ found Hackel had moderate difficulties in social functioning and with concentration, persistence, or pace. (Tr. 27.) The ALJ found Hackel experienced one to two episodes of decompensation, each of extended duration. (*Id.*) Because the ALJ found Hackel's mental impairments did not cause at least two marked limitations or one marked limitation and repeated episodes of decompensation, each of extended duration, the "paragraph B" criteria (the "paragraph D" criteria of Listing 12.05) were not satisfied. (*Id.*)

-16-

The ALJ also considered whether the "paragraph C" criteria of Listing 12.02 was satisfied. (*Id.*) To satisfy the "paragraph C" criteria, the claimant must have a medically documented history of a chronic organic mental disorder of at least two years' duration that has caused more than a minimal limitation of ability to do basic work activities with symptoms or signs. (*Id.*) The disorder must be currently attenuated by medical or psychosocial support and one of the following: (1) repeated episodes of decompensation, each of extended duration; or (2) a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or (3) a current history of one or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement. (Tr. 27-28.) The ALJ found no record evidence documenting the existence of any of the three criteria. (Tr. 28.)

The ALJ then considered the "paragraph A" criteria of Listing 12.05. These criteria are met when there is mental incapacity evidenced by dependence on others for personal needs and inability to follow directions, such that the use of standardized measures of intellectual functioning is precluded. (*Id.*) The ALJ found that these requirements were not met because Hackel was able to live in a condominium alone and could complete virtually all of her activities of daily living without particular assistance. (*Id.*) The ALJ further found that the "paragraph B" criteria were not met because there was no evidence that Hackel received a valid verbal, performance, or full-scale IQ score of 59 or less. (*Id.*)

The ALJ considered the "paragraph C" criteria of Listing 12.05 and found Hackel did not meet it because she did not have a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation

-17-

of function. (*Id.*) Even though Bernstein opined Hackel had a full scale IQ score of 65, the ALJ rejected this finding because Bernstein was not an acceptable medical source, Hackel received a full scale IQ score of 71 less than one month later, and Hackel submitted a letter stating that she was under a lot of stress when Bernstein's test was completed. (*Id.*) The ALJ further found that Hackel's activities of daily living, the medical evidence of record, and the testimony provided at the hearing supported the IQ score of 71. (*Id.*) Thus, the ALJ found that Hackel did not meet or functionally equal either Listing 12.02 or 12.05.

The ALJ further found that Hackel had the residual functional capacity to perform a full range of work at all exertional levels, but with the following non-exertional limitations: limited to simple, routine, and repetitive work tasks; make only simple work related decisions; have only occasional contact with coworkers and supervisors; and never perform work that requires public contact. (Tr. 29.) In making her RFC determination, the ALJ found that although Hackel's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," her "statements concerning the intensity, persistence and limiting effects" of the symptoms were "not entirely credible for the reasons explained in [the] decision." (Tr. 30.)

In support of this RFC determination, the ALJ found that Hackel's mental impairments of borderline intellectual functioning and pervasive developmental disorder were not so severe that they interfered with her ability to perform simple and routine tasks. (*Id.*) Specifically, the ALJ considered the fact that Hackel received services through the State agency vocational rehabilitation agency and was able to pass the academic portion of the forklift-training program, though she had difficulty actually demonstrating the skills. (*Id.*) Further, Hackel was hired by a janitorial services company in October 2009 and she successfully finished a 90-day placement of employment. (*Id.*)

-18-

The ALJ also considered and went through evidence from each of the treating sources, as well as the examinations and treatment conducted in relation to Hackel's competency evaluations for criminal proceedings. (Tr. 30-32.) As to the opinion evidence, the ALJ assigned little weight to Bernstein's opinion that Hackel would need to be placed in a sheltered work site because it was inconsistent with Hackel's work history, activities of daily living, and the majority of medical evidence in the record. The ALJ also considered the fact that Bernstein was not an acceptable medical source. (Tr. 32.) The ALJ also assigned little weight to Majid-Swanton's opinion that Hackel had severe limitations in interpersonal skills and work skills, because she was not an acceptable medical source and her opinions were based primarily on Hackel's statements rather than examination findings. (Tr. 33.)

The ALJ assigned significant weight to the opinion of state agency physician Dr. Spear because of his familiarity with the program and because his opinion was consistent with the credible medical evidence of record. (*Id.*) The ALJ considered the medical source statement of Hackel's treating psychologist Dr. Gust-Brey and assigned it little weight because it was "grossly inconsistent" with her treatment records and the credible medical evidence of record. (*Id.*) The ALJ also assigned some weight to Hackel's GAF score estimate of 68, which indicates mild symptoms, because it was generally consistent with the medical evidence of record and her reported activities of daily living. (Tr. 33-34.)

Regarding Hackel's credibility, the ALJ found that Hackel's description of her daily activities were not limited to the extent one would expect given her complaints of disabling symptoms. (Tr. 34.) The ALJ considered, among other things, Hackel's long work history, the fact she assisted her elderly father, her ability to do household chores, and the fact she frequently leaves the house. (*Id.*)

Further, the ALJ considered the fact Hackel does not take any medications for anxiety, despite complaints of disabling symptoms from anxiety. (*Id.*)

Finally, the ALJ found that Hackel could perform her past relevant work as a cleaner housekeeper, routing clerk, and candy maker. (*Id.*) As such, the ALJ found that Hackel had not been under a disability from December 1, 2009, through the date of the decision. (Tr. 35.)

## DISCUSSION

### 1. *Applicable Legal Standards*

#### 1.1 Judicial Review

Under 42 U.S.C. § 405(g), this Court's review is limited to determining whether the ALJ's decision is supported by "substantial evidence" and is based on the proper legal criteria. *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004). The ALJ's findings of fact, when supported by substantial evidence, are conclusive. § 405(g). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008) (quoting *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004)). "Although a mere scintilla of proof will not suffice to uphold an ALJ's findings, the substantial evidence standard requires no more than such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Blakes ex rel. Wolfe v. Barnhart*, 331 F.3d 565, 568 (7th Cir. 2003); *see also Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001).

In reviewing the decision of the Commissioner, this Court is obligated to review all the evidence contained in the record and such review "must be more than an uncritical rubber stamp." *Delgado v. Bowen*, 782 F.2d 79, 82 (7th Cir. 1986) (internal quotation and citation omitted). However, this Court may not decide the facts anew, reweigh the evidence, or substitute its own judgment for

Case 2:14-cv-01429-NJ   Filed 02/22/16   Page 20 of 34   Document 14

that of the Commissioner. *Powers v. Apfel*, 207 F.3d 431, 434 (7th Cir. 2000). However, even if substantial evidence supports the Commissioner's findings, this Court may reverse if the ALJ committed an error of law. *White v. Apfel*, 167 F.3d 369, 373 (7th Cir. 1999). Failure to follow the Commissioner's regulations and rulings constitutes legal error. *Prince v. Sullivan*, 933 F.2d 598, 602 (7th Cir. 1991).

An ALJ must "'minimally articulate his reasons for crediting or rejecting evidence of disability,'" *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir.2000) (quoting *Scivally v. Sullivan*, 966 F.2d 1070, 1076 (7th Cir. 1992)), "build[ing] an accurate and logical bridge from the evidence to his conclusion," *id*. at 872. Although the ALJ need not discuss every piece of evidence, he or she cannot select and discuss only the evidence supporting the decision. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). Evidence favoring as well as disfavoring the claimant must be examined by the ALJ, and the ALJ's decision should reflect that examination. *Zurawski*, 245 F.3d at 888. If the ALJ's decision lacks evidentiary support or is "so poorly articulated as to prevent meaningful review," the district court should remand the case. *Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 785 (7th Cir. 2003) (internal quotation omitted). However, a "sketchy opinion" may be sufficient if it is clear the "ALJ considered the important evidence" and the ALJ's reasoning can be traced. *Id.* at 787.

### 1.2    Disability Standard

The Social Security Act authorizes disability benefits for those who are unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). In order to be found disabled, a plaintiff must demonstrate that her physical or mental impairments prevent her from

doing not only her previous work, but any other substantial gainful employment which exists in the national economy considering her age, education, and work experience. 42 U.S.C. § 423(d)(2)(A).

The Administration has adopted a sequential five-step process for determining whether a claimant is disabled. 20 C.F.R. §§ 404.1520, 416.920. The ALJ must determine at step one whether the claimant is currently engaged in substantial gainful activity. If so, she is not disabled. If not, at step two, the ALJ must determine whether the claimant has a severe physical or mental impairment. If not, the claimant is not disabled. If so, at step three the ALJ determines whether the claimant's impairments meet or equal one of the impairments listed in the Administration's regulations (the Listings) as being so severe as to preclude substantial gainful activity. If so, the claimant is found disabled. If not, at step four the ALJ determines the claimant's RFC and whether the claimant can perform her past relevant work. If she can perform her past relevant work, she is not disabled. However, if she cannot perform past work, then at step five the ALJ determines whether the claimant has the RFC, in conjunction with age, education, and work experience, to make the adjustment to other work. If the claimant can make the adjustment, she is found not disabled. If she cannot make the adjustment, she is found disabled. 20 C.F.R. 404.1520; *see Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004).

RFC is the most the claimant can do in a work setting "despite her limitations." *Young*, 362 F.3d at 1000–01; *see also* 20 C.F.R. § 404.1545(a)(1); Social Security Ruling ("SSR") 96-8p. The Administration must consider all of the claimant's known, medically determinable impairments when assessing RFC. 20 C.F.R. § 404.1545(a)(2), (e). The burden of moving forward at the first four steps is on the claimant. At step five, the burden shifts to the Commissioner to demonstrate that the

-22-

claimant can successfully perform a significant number of other jobs that exist in the national economy. *See Young*, 362 F.3d at 1000.

> **2.** **Application to this Case**

Hackel argues that the ALJ erred in two principal ways. First, Hackel argues the ALJ erred in finding that she did not meet or medically equal Listing 12.02 or 12.05. Second, Hackel argues the ALJ erred in assessing her RFC, including the weight given to the medical opinions. Within Hackel's RFC argument, she argues the ALJ unduly focused on her activities of daily living. I will address each in turn.

> 2.1    Consideration of the Listings

Hackel argues the ALJ erred at step three in determining whether her impairments met or medically equaled one of the listed impairments. The plaintiff has the burden of showing that her impairments meet or medically equal a Listing. *Scheck*, 357 F .3d at 700. To establish an impairment or combination of impairments that match or are equivalent to a listed impairment, a plaintiff must present medical findings that meet or are equal in severity to all of the criteria in a listing. *Sullivan v. Zebley*, 493 U.S. 521, 530–31 (1990) (citing SSR 83–19 and 20 C.F.R. § 416.926(a)). When the plaintiff presents evidence suggesting that her impairment meets a listing, the administrative law judge should mention in her decision the specific listings she is considering and perform more than a perfunctory analysis of whether the plaintiff's impairment meets or medically equals that listing. *Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006).

Hackel argues that the record evidence supports a finding that her mental impairments meet or medically equal either Listing 12.02 or 12.05 and that the ALJ erred in finding otherwise. To meet Listing 12.02 (Organic Mental Disorders), one must meet the requirements in paragraphs A and B,

Case 2:14-cv-01429-NJ   Filed 02/22/16   Page 23 of 34   Document 14

or meet the requirements in paragraph C. While Hackel argues she meets the "paragraph B" criteria of Listing 12.02, she makes no argument that she also meets either the "paragraph A" criteria, or the "paragraph C" criteria. It is Hackel's burden to show she either meets or medically equals the listing. She has not met her burden as to Listing 12.02.

Hackel focuses, rather, on Listing 12.05. Listing 12.05 (Intellectual Disability, formerly called Mental Retardation) provides a "capsule" definition of "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22." To meet Listing 12.05, one must meet both the capsule definition and the requirements in paragraphs A, B, C, or D. Hackel does not argue that she meets either "paragraph A" or "paragraph B" of Listing 12.05. Rather, she argues that she meets the capsule definition and "paragraph C" and/or "paragraph D."

The ALJ does not discuss in detail the capsule definition. Rather, she simply finds that there is no evidence of adaptive functioning deficits. (Tr. 28.) "Deficits in adaptive functioning" means the "inability to cope with the challenges of ordinary everyday life." *Novy v. Astrue*, 497 F.3d 708, 710 (7th Cir. 2007) (citing American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, Text Revision (DSMIV-TR) 42 (4th ed. 2000)). In *Novy*, the Seventh Circuit found the fact the plaintiff lived on her own, cared for her three children without help, fed herself and the children, paid her bills, and avoided eviction demonstrated that she could cope with the challenges of ordinary, everyday life. *Id.*

Similarly, the evidence of record does not demonstrate deficits in adaptive functioning. Even though Hackel's father testified that she does not help him "a real lot," (Tr. 68), Dr. Paquette noted

-24-

that Hackel cared for her father three to four days a week. (Tr. 343). Similarly, her treating psychologist Dr. Gust-Brey, noted that Hackel "continu[ed] to stay as active as she can in terms of helping out her father and babysitting for friends and relatives." (Tr. 420.) Hackel herself noted in her Function Report-Adult that she "help[s] out with [her] parents a lot." (Tr. 228.) Further, the record evidence shows that Hackel lived independently and was able to perform her activities of daily living independently. (Tr. 228-30, 343, 504, 530, 712, 746.)

Nor can Hackel show that she meets either the "paragraph C" or "paragraph D" criteria. "Paragraph C" requires a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function. Although Bernstein found a full scale IQ score of 65 (Tr. 311), the ALJ properly discounted this finding. The ALJ found that Bernstein was not an acceptable medical source, but considered her as an "other source." (Tr. 28.) The ALJ properly considered the fact that less than one month later, Dr. Paquette assessed her full scale IQ as 71 (Tr. 344) and Hackel herself acknowledged that she was under a lot of stress when she completed Bernstein's test (Tr. 306). The ALJ also considered the fact that there was no evidence of adaptive functioning deficits, her activities of daily living, the medical evidence of record, and Hackel's own testimony in accepting Dr. Paquette's IQ assessment over Bernstein's. (Tr. 28.)

Regarding the "paragraph D" criteria, one must have a valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following: (1) Marked restriction of activities of daily living; or (2) Marked difficulties in maintaining social functioning; or (3) Marked difficulties in maintaining concentration, persistence, or pace; or (4) Repeated episodes of decompensation, each of extended duration. The ALJ also considered whether Hackel met any of those four requirements,

-25-

and found no restrictions in activities of daily living, moderate difficulties in social functioning, moderate difficulties in concentration, persistence, or pace, and one to two episodes of decompensation.

To begin, Hackel mistakenly argues that because "the ALJ conceded that Hackel 'has experienced one to two episodes of decompensation,'" she need only show that her mental impairments caused marked restrictions in one of the three "paragraph D" criteria. (Pl.'s Br. at 16, Docket # 11.) To meet the "paragraph D" criteria, one must have "repeated" episodes, not one or two. Hackel does not challenge the ALJ's finding that she did not have "repeated" episodes of decompensation. (Tr. 27.)

As to the other three criteria, as discussed above, the record evidence supports the ALJ's finding of no restrictions of activities of daily living. With regard to maintaining social functioning, the ALJ's finding of moderate difficulties is supported by the record. The ALJ noted that social functioning refers to an individual's capacity to interact independently, appropriately, effectively, and on a sustained basis with other individuals. (*Id.*) The ALJ acknowledged Hackel's statement that other people have difficulty getting along with her; however, the ALJ found that Hackel stated in her Function Report that she had no problems getting along with others and that she was able to spend time going out to eat, shopping, hanging out, and watching movies. (*Id.*)

While Hackel points to Majid-Swanton's opinion that she has severe limitations in interpersonal skills due to the fact she lacks verbal inhibition and self-monitoring skills (Tr. 328), Dr. Spear considered this evidence and still found her only moderately limited in maintaining social functioning (Tr. 348). Dr. Spear also considered the record evidence that Hackel was redundant in her speech, lacked verbal inhibitor and self-monitoring skills, seemed unaware of her immediate

-26-

social impact, and needed redirection in finding her moderately limited. (*Id.*) The ALJ assigned great weight to Dr. Spear's opinion. Further, other record evidence showed that Hackel "din[ed] in the community with girlfriends once a week," goes bowling with friends (Tr. 343, 582), and used to belong to a bowling league (Tr. 504). Her treating psychologist Dr. Gust-Brey, noted that Hackel could be "quite social" (Tr. 453), that she liked engaging with others (Tr. 454), described her as "outgoing" (Tr. 416), and noted on several occasions that she dealt with stress and anxiety through socializing (Tr. 417, 420, 421, 438, 469).

Similarly, the ALJ's finding of moderate difficulties in maintaining concentration, persistence, or pace is supported by the record. In finding moderate difficulties, the ALJ considered Hackel's difficulties handling money, her short attention span, the fact that she stated she usually did not finish what she started, that she had difficulty following instructions, and that she had difficulty handling changes in routine. (Tr. 27.) Dr. Spear opined that the overall evidence indicated that Hackel could understand, remember, and carry out simp1e instructions (Tr. 348) and he found only moderate difficulties in maintaining concentration, persistence, or pace (Tr. 360). While Hackel points to Bernstein's record indicating that Hackel's sustained attention and concentration were limited (Tr. 309) and Dr. Gust-Brey's opinion that Hackel had extreme limitation in her ability to understanding and remember complex instructions and marked limitations in understanding and remembering simple instructions (Tr. 432), Dr. Gust-Brey's records indicate that although Hackel reported difficulty in the area of memory and concentration, she found them to be intact (Tr. 429). Dr. Paquette also stated that Hackel's attention and concentration were "adequate," noting that she was able to follow the conversation and could recall five digits forward, three in reverse, and three of three objects immediately. (Tr. 342.) Similarly, Dr. Engen found that Hackel's attention and

-27-

concentration were "sufficiently intact," demonstrated by her ability to track the interview. (Tr. 619.) Thus, the record supports the ALJ's finding of only moderate difficulties.

Because Hackel has not shown she meets the capsule definition in Listing 12.05, nor has she shown that she meets the severity criteria found in paragraphs A through D, Hackel has not demonstrated that she meets or medically equals Listing 12.05.

### 2.2 The ALJ's RFC Determination

As stated above, RFC is the most the claimant can do in a work setting "despite her limitations." *Young*, 362 F.3d at 1000–01. The Administration must consider all of the claimant's known, medically determinable impairments when assessing RFC. 20 C.F.R. § 404.1545(a)(2), (e). "As part of the determination of a claimant's residual functional capacity to work, the ALJ often assesses the claimant's credibility." *Gayfield v. Astrue*, No. 12–CV–375, 2012 WL 5471874, *2 (E.D. Wis. Nov. 9, 2012). In making an RFC determination, ALJs must evaluate the effect of a claimant's subjective symptoms. *Id.* The ALJ evaluates subjective complaints using a two-step process: first, the ALJ determines whether objective medical evidence exists that could "reasonably be expected to produce" the symptoms; and, second, the ALJ must evaluate the intensity, persistence, and effects of the symptoms to determine how much they truly limit the claimant. 20 C.F.R. §§ 404.1529, 416.929. The ALJ "often assesses the claimant's credibility in the second of those steps, in order to assign appropriate weight to the claimant's testimony regarding the intensity, persistence, and effects of his symptoms." *Gayfield*, 2012 WL 5471874 at *2.

The ALJ's RFC finding is supported by substantial evidence in the record. The ALJ found that Hackel had the RFC to perform a full range of work at all exertional levels, but with the following non-exertional limitations: limited to simple, routine, and repetitive work tasks; make only

-28-

simple work related decisions; have only occasional contact with coworkers and supervisors; and never perform work that requires public contact. (Tr. 29.) Hackel does not challenge the ALJ's finding that she is capable of performing a full range of work at all exertional levels. Rather, she argues the ALJ erred in the assessment of her non-exertional limitations. However, the limitations the ALJ gave are entirely consistent with the opinion of Dr. Spear, who the ALJ accorded significant weight. Although Hackel does not specifically dispute the ALJ's reliance on Dr. Spear's opinion (and in fact states that Dr. Spear's opinion was entitled to greater weight than the amount given by the ALJ) (Pl.'s Br. at 22), she argues that the ALJ erred by failing to give greater weight to the opinions of Majid-Swanton, Bernstein, and Dr. Gust-Brey (Pl.'s Br. at 24). Hackel further argues that the ALJ improperly equated her activities of daily living with her ability to work and failed to properly account for her work history. (*Id.* at 24-27.)

The ALJ did not err in the weight given to the opinions of Majid-Swanton, Bernstein, and Dr. Gust-Brey. Majid-Swanton, Hackel's case facilitator at the Wisconsin Department of Workforce Development's Division of Vocational Rehabilitation, opined that Hackel had a severe limitation in communication because of her redundancy; a severe limitation in interpersonal skills and acceptance because of her lack of verbal inhabitation and self-monitoring skills; and a severe limitation in the area of work skills because she will require a job coach to learn job skills and get along with others. (Tr. 327-28.) The ALJ rejected Majid-Swanton's opinion because she was not an acceptable medical source and her opinions were based primarily on statements made by the claimant, rather than examination findings. (Tr. 33.) While Hackel asserts that the ALJ incorrectly found Majid-Swanton to be an unacceptable medical source, she offers little to no explanation as to how the ALJ further erred in the weight given to her opinion. The ALJ is correct that Majid-

-29-

Swanton is not an acceptable medical source. As relevant here, to be considered an acceptable medical source, one must be a licensed or certified psychologist. 20 C.F.R. § 404.1513(a)(2). There is no evidence in the record Majid-Swanton met that criteria and the record supports the ALJ's finding that Majid-Swanton's information was based primarily on Hackel's own statements, which the ALJ found not entirely credible.

Bernstein opined Hackel had ADHD and found that she functioned in the mildly impaired range of intellectual abilities. (Tr. 316.) Bernstein opined that Hackel did not have a learning disorder, that her basic academic abilities equaled or exceeded expectation, and found that she could perform even better on tests if she could better direct her attention and monitor and regulate her own actions. (*Id.*) Bernstein opined that Hackel would need special job placement with job coaching and that "[t]ask complexity and limited opportunity for social interaction would be primary placement considerations." (Tr. 317.) While Bernstein believed there would be "many potential benefits associated with employment," she found that "unless Ms. Hackel were to have a favorable medication response, it would seem reasonable that some consideration be given to appealing her denial of Social Security Disability benefits because Ms. Hackel would likely eventually need to be placed at a sheltered work site (which she would likely reject)." (*Id.*)

The ALJ rejected Bernstein's opinion that Hackel would "likely eventually" need to be placed at a sheltered work site because Bernstein is not an acceptable medical source and because her opinion was inconsistent with Hackel's work history, inconsistent with her activities of daily living, inconsistent with the majority of the medical evidence, and because she does not have any particular expertise in vocational rehabilitation. (Tr. 32.) Hackel argues that the ALJ improperly rejected Bernstein's opinion because Bernstein was an acceptable medical source and because Bernstein based

-30-

this opinion, in part, on her review of Hackel's work history. (Pl.'s Br. at 22.) As with Majid-Swanton, the ALJ correctly found that Bernstein was not an acceptable medical source, but considered her as an "other source." (Tr. 30.) Further, it does not appear that Bernstein based her opinion about the need for a sheltered work site on Hackel's work history; rather, she found that the sheltered work site might be necessary because she felt Hackel needed medication to control her ADHD symptoms. (Tr. 317.) I agree with the ALJ that Bernstein's opinion is inconsistent with Hackel's work history. Bernstein acknowledges that Hackel said she was diagnosed with ADHD as a child but has never taken medication for it. (*Id.*) Despite this finding, she has worked since childhood, including for five years with one employer, without the need for a sheltered work site. Further, no other source opined a sheltered work site was necessary.

Finally, Dr. Gust-Brey opined that Hackel was markedly limited in her ability to understand and remember simple instructions, in her ability to make judgments on simple work-related decisions, in her ability to make judgment on complex work-related decisions, and her ability to communicate clearly with others. (Tr. 432.) She further opined that Hackel was extremely limited in her ability to understand and remember complex instructions, in her ability to interact appropriately with the public, in her ability to interact appropriately with supervisors, and her ability to respond appropriately to usual work situations and to changes in a routine work setting. (*Id.*) The ALJ rejected Dr. Gust-Brey's opinion because it was grossly inconsistent with her treatment records and the credible medical evidence of record. (Tr. 33.)

While Hackel argues that the ALJ's statement regarding the gross inconsistency between the treatment records and opinion "is simply incorrect," beyond noting that Dr. Gust-Brey "consistently diagnosed and assessed Hackel with adjustment disorder with mixed anxiety and depressed mood,

-31-

learning disorder, and pervasive development disorder," (Pl.'s Br. at 21), she does nothing to show that the ALJ's finding is "simply incorrect." Rather, Dr. Gust-Brey's treatment records are indeed grossly inconsistent with her opinion. For example, while she opines that Hackel is markedly limited in her ability to understand and remember simple instructions, she also notes that Hackel can do very simple, repetitive jobs (Tr. 427) and that her memory and concentration were "intact" (Tr. 426). In only one record does Dr. Gust-Brey note in passing that Hackel had "difficulty coping with changes in routine, remembering what she needed to do, and working quickly." (Tr. 453.) Having "difficulty" is a far cry from a "marked" limitation, which is defined for purposes of the evaluation as a "substantial loss in the ability to effectively function." (Tr. 431.) Further, Dr. Gust-Brey opines that Hackel has "extreme" limitations in her social interactions. Extreme is defined for purposes of the evaluation as a "major limitation," meaning there is "no useful ability to function in this area." (*Id.*) Dr. Gust-Brey's records, however, paint a very different picture of Hackel. She frequently noted that Hackel managed her stress and depression by staying active, including by socializing with family and friends. (Tr. 416-18, 420-22, 438, 453-55, 461, 469.)

Hackel also argues the ALJ improperly equated Hackel's activities of daily living with an ability to work. While Hackel is correct that the Seventh Circuit has cautioned ALJs against "placing undue weight on a claimant's household activities in assessing the claimant's ability to hold a job outside the home" *Mendez v. Barnhart*, 439 F.3d 360, 362–63 (7th Cir. 2006); *see also Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012), an ALJ may discount a claimant's credibility if she finds that the claimant's self-reported limitations are inconsistent with evidence of the claimant's daily activities, *See Simila v. Astrue*, 573 F.3d 503, 517–18 (7th Cir . 2009). This is clearly what the ALJ was doing with regard her Hackel's activities of daily living. The ALJ specifically stated that Hackel "has

-32-

described daily activities, which are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations." (Tr. 34.) Thus, it is proper for the ALJ to consider a claimant's activities of daily living in assessing her credibility because inconsistencies between activities of daily living and the claimant's self-reported limitations may suggest that a claimant's testimony regarding her symptoms are exaggerated, which undermines her credibility. *See Klahn v. Colvin*, No. 13-CV-165, 2014 WL 841523, *9 (E.D. Wis. Mar. 4, 2014).

And the ALJ is correct that Hackel's activities of daily living undermine her credibility. While Hackel argues that the ALJ is incorrect in her finding that Hackel could live independently and helped her father, the record overwhelming supports this finding. As explained above, even though Hackel's father testified that she does not help him "a real lot," (Tr. 68), Dr. Paquette noted that Hackel cared for her father three to four days a week (Tr. 343), Dr. Gust-Brey noted that Hackel "continu[ed] to stay as active as she can in terms of helping out her father and babysitting for friends and relatives" (Tr. 420), and Hackel herself noted in her Function Report-Adult that she "help[s] out with [her] parents a lot" (Tr. 228). Further, the record evidence shows that Hackel lived independently and was able to perform her activities of daily living independently. (Tr. 228-30, 343, 504, 530, 712, 746.)

Hackel also faults the ALJ for failing to consider the fact that she held many jobs and had performance issues on the job (Pl.'s Br. at 24-25); however, the ALJ clearly considered Hackel's testimony that she had been fired from multiple positions due to poor performance (Tr. 30). However, Hackel does not meaningfully dispute the ALJ's finding that she engaged in substantial gainful activity during the entirety of 2010, which is subsequent to her alleged onset date of

-33-

December 1, 2009. (Tr. 23, 25.) Thus, the ALJ's RFC determination is supported by substantial evidence.

## CONCLUSION

Hackel argues the ALJ erred in finding that she did not meet a listing and in her RFC determination. I find the ALJ's decision is supported by substantial evidence. Therefore, the Commissioner's decision is affirmed.

## ORDER

**NOW, THEREFORE, IT IS ORDERED** that the Commissioner's decision is **AFFIRMED**.

**IT IS FURTHER ORDERED** that this action is **DISMISSED**. The Clerk of Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 22nd day of February, 2016.

BY THE COURT:

*s/Nancy Joseph*
NANCY JOSEPH
United States Magistrate Judge

-34-